TENANTS OF 500 23RD STREET, N.W., et al., Petitioners,

v.

DISTRICT OF COLUMBIA RENTAL HOUSING COMMISSION, Respondent.

Columbia Plaza Limited Partnership, Intervenor.

No. 89–1429.

District of Columbia Court of Appeals.

Argued Nov. 15, 1990.

Decided Jan. 22, 1991.

James P. McGranery, Washington, D.C., for petitioners.

Vincent Mark J. Policy, Washington, D.C., for intervenor.

Herbert O. Reid, Sr., Corp. Counsel at the time the statement was filed, and Charles L. Reischel, Washington, D.C., Deputy Corp. Counsel, filed a statement in lieu of brief, for respondent.

Before BELSON, TERRY, and FARRELL, Associate Judges.

FARRELL, Associate Judge:

This petition for review levels eight claims of error at a decision of the Rental Housing Commission granting capital improvement petitions for rent ceiling increases in three buildings that form part of a complex known as Columbia Plaza in Northwest Washington, D.C. Only a few of the points raised by petitioners merit

discussion, and we affirm the Commission's order in all respects.

## I.

The work underlying the capital improvement petitions consisted of replacing the "roof assemblies" on the three buildings at a total cost of $348,254.00. Intervenor (the "housing provider") began work on the roof replacements a few days after filing the petitions. After a hearing, the Rent Administrator dismissed the petitions, construing D.C.Code § 45–2520(i) (1990) as requiring that when capital improvements are begun as "immediately necessary" under § 45–2520(g), as was the case here, the petition may only be filed within the 10–day period *after* installation of the improvements is completed, not before.[1] On appeal by the housing provider, the Commission rejected this reading of the statute and remanded for a decision by the Rent Administrator on the merits of the petitions. A hearing examiner then heard evidence on the principal question of whether the roof replacements were "immediately necessary," and hence could be undertaken without prior approval of the rent adjustment. See note 1, *supra*. The examiner concluded that the roof replacements were not immediately necessary and again dismissed the petitions. The housing provider appealed, and on November 9, 1989, the Commission again reversed the Rent Administrator's decision, concluding as a matter of law that the housing provider had satisfied the immediate necessity requirement of § 45–2520(g).

## II.

■ Petitioners' primary argument before us is that the Commission exceeded its scope of review by conducting a *de novo* review of the evidence adduced on the issue of immediate necessity, contrary to D.C.

---

1. D.C.Code § 45–2520(g) provides: "The housing provider may make capital improvements to the property before the approval of the rent adjustment by the Rent Administrator for the capital improvements where the capital improvements are immediately necessary to maintain the health or safety of the tenants." D.C. Code § 45–2520(i), in turn, provides that "[t]he housing provider may petition the Rent Administrator for approval of the rent adjustment for any capital improvements made under subsection (g) of this section, if the petition is filed with the Rent Administrator within 10 calendar days from the installation of the capital improvements."

Code § 45–2526(h) (Commission may reverse administrator's decision if "unsupported by substantial evidence on the record"). We disagree, for it is apparent that the Commission accepted the facts as found by the hearing examiner, or that were undisputed, but determined that the examiner's application of the law to those facts was erroneous as a matter of law.

The Commission relied upon its decision in *Magizine v. Tenants of the Berkshire Apartments*, CI 20,200 (RHC Sept. 27, 1988), which had interpreted the language "immediately necessary" in § 45–252(g) in the following manner:

> We are inclined to give the benefit of the doubt to the housing provider who moves to correct an obvious health hazard, and we would deny the related rent increase *only where the pre-approval work bore no reasonable relationship to a serious health hazard.* To invoke the exception of § 210(g) [D.C.Code § 45–2520(g)], only the potential for serious harm need be immediate and one may act prudently before the harm itself is realized. [Emphasis added.]

Petitioners do not question this interpretation of the statutory phrase, and we would defer to it in any event as a reasonable construction of the statute the agency is charged with administering. *Winchester Van Buren Tenants Ass'n v. District of Columbia Rental Hous. Comm'n*, 550 A.2d 51, 55 (D.C.1988) (Commission's interpretation of statute must be sustained unless plainly wrong or inconsistent with legislative purpose). Moreover, we think that the ultimate judgment of whether improvements are "immediately necessary" under § 45–2520(g) is at best a mixed one of law and fact, as to which the Commission must make its own determination while deferring to the subsidiary findings of the examiner. *See* D.C.Code § 45–2526(h) (Commission may reverse decision of administrator "not in accordance with the provisions of this chapter"); *see also McCulloch v. District of Columbia Rental Hous. Comm'n*, 584 A.2d 1244, 1249–1250 (D.C.1991) (Commission properly made own determination that facts adduced before hearing examiner

were sufficient, as a matter of law, to establish that violations of housing code were "substantial" within statutory meaning). *Cf. Davis v. United States*, 564 A.2d 31 (D.C.1989) (en banc).

We find no basis in this record for disturbing the Commission's judgment that the roof improvements bore a "reasonable relationship to a serious health hazard." Essentially uncontradicted testimony by the president of an engineering firm consulted by the housing provider established, in the Commission's words,

> that there was extensive deterioration of the existing [roof] membranes, that there was clear moisture penetration through the roofs into apartments and that the roofs had performed as long as they were going to reliably perform. In fact, he testified that when the roofs were removed there was some structural damage visible. He testified that the life of a roof is somewhere near 20 years. Of the original five buildings, two had already had new roofs put on and the roofs of the remaining three buildings which are the subject of this case were 25 years old.

Moreover, the engineering consultant

> testified to the urgency of getting the main portion of the roof membranes and the flashing changed in order to put the roofs in a basic watertight condition before the cold winter weather set in. Had these corrections not been made, the repeated freezing and melting of water during the winter would have caused trapped moisture to expand, tear the roof covering and cause more leakage and damage. He also stressed the difficulty of performing roof repairs in cold weather.

Petitioners contend that the Commission failed to give adequate weight to the hearing examiner's finding that, because of repairs previously made, "there was a dramatic reduction in the need for roof repairs after April 19, 1987," five months before the capital improvement petitions were filed. The Commission, however, reasonably concluded that the examiner had placed too much reliance on the decline in

the number of repair tickets reflecting work performed, when there was uncontradicted testimony of continuing leaks and water damage, including collapsed ceilings, throughout six floors of a tier in one building as late as August 1987, one month before the filing.[2]

The hearing examiner also found that the housing provider had known the roofs needed replacing ever since receiving a September 1986 engineering report, but had delayed in letting contracts for the repairs until the summer of 1987, thus itself causing any "immediate necessity" that now existed. But, as the Commission pointed out, the fact that the provider has not "move[d] as expeditiously as a hypothetical prudent man would do in similar circumstances" cannot bar recourse to § 45–2520(g) "if the objective facts are that the correction is immediately necessary to protect the health and safety of the tenants." The Commission's judgment that by the fall of 1987 "[t]he potential for damage to all apartments was real" unless the improvements began immediately is well supported in the record, and must be sustained.

### III.

██ Petitioners also contend that the Commission erred in "waiving" several requirements imposed by the statute as a condition of obtaining approval of capital improvement petitions. First, they point to the housing provider's failure to prove compliance with the inspection requirement of D.C.Code § 45–2518. That statute prohibits an increase above the base rent unless the housing accommodation is in substantial compliance with the housing regulations; "substantial compliance," in turn, is defined to include the requirement that a housing accommodation has been inspected by the Department of Consumer and Regulatory Affairs within the 30 days immediately before the filing of a petition for

adjustment in the rent ceiling. § 45–2518(b)(2). The Commission acknowledged that in a previous decision[3] it had reversed the Rent Administrator's "long standing policy of less than full enforcement" of the inspection requirement in connection with petitions for a rent ceiling adjustment. The Commission noted, however, that in the same opinion it had made this policy change prospective only and inapplicable to petitions—such as the instant ones—filed before the date of the change.

The Commission was within its authority in refusing to apply the inspection requirement to the present petitions. *See generally Reichley v. District of Columbia Dep't of Employment Servs.*, 531 A.2d 244, 251 (D.C.1987) (setting forth standards governing retroactivity of agency decisions). Compliance with the inspection requirement does not appear in § 45–2520 among the facts which the housing provider "shall establish to the satisfaction of the Rent Administrator" to gain an increase in the rent ceiling covering the cost of capital improvements. Rather, it appears in § 45–2518 as part of the definition of substantial compliance with the housing regulations. Before the Commission's decision in *Tenants of 1709 Capitol Ave., N.E.*, *supra* note 3, it cannot have been obvious to housing providers that the Rent Administrator's policy of not requiring proof of inspection at the present stage was erroneous. Indeed, in another portion of its present opinion, the Commission adhered to the view that "[p]roof of compliance with the Housing Code is not part of the required proof in a capital improvement petition [seeking increase in the rent ceiling]," but rather, under § 45–2518(a), "such compliance is a requirement that must be met before the rent *actually charged* can be raised" (emphasis added). Although henceforth the Commission will require satisfaction of the inspection requirement before

---

**2.** The Commission also noted the testimony that repairs often were performed by building employees, whose work would not be reflected in repair tickets, rather than by outside contractors, and that a roof's overall condition can be deteriorating despite the lack of leakage reports.

**3.** *Tenants of 1709 Capitol Ave., N.E. v. 17th & L St. Properties,* HP 20,328 (RHC Dec. 15, 1987). That case involved a hardship petition, D.C.Code § 45–2522, not a capital improvement petition, but the Commission did not distinguish it from the present case on that ground.

capital improvement petitions may be granted, its refusal to dismiss the petitions for non-compliance with that requirement in this case was not error.

■ Petitioners also challenge the Commission's failure to dismiss the petitions for non-compliance with the requirement that the housing provider demonstrate that "required governmental permits and approvals have been secured." Unlike the inspection provision, the permit requirement is set forth expressly in § 45–2520(b) as one fact the provider "shall establish" in order to win approval of a capital improvement petition. Nevertheless, the Commission applied in this case its decision in *Tenants of 1601 Argonne Place, N.W. v. Columbia Realty Venture*, CI 20,199 (RHC July 19, 1989), which had held that in the extraordinary circumstances of that case non-compliance with the permit requirement would not bar the capital improvement petition.[4] The *Tenants of 1601 Argonne Place* decision is presently before this court on petitions for review (Nos. 89–1256, –1315). We conclude that it is unnecessary for us to consider here its correctness or application to the present circumstances, for we agree with the housing provider that, as a matter of law, there were no "required governmental permits and approvals" to be obtained with respect to the capital improvements in this case. The only permit or approval arguably in question is a construction permit. The District of Columbia Construction Codes Supplement, however, provides in 12A DCMR § 104.1 (1987):

> Minor repairs and alterations to buildings or structures may be made without application or notice to the Director [of the Department of Consumer and Regulatory Affairs].... Minor repairs shall

include the replacement in kind of the following: *roofing,* gutters, downspouts [Emphasis added.][5]

The petitions in this case each described the improvement as a "new roof"; the contract underlying the petitions defined the work as, in essence, "[r]emoval and replacement of complete roof assemblies," a term further defined as "including stone surfacing, membrane, insulation and flashings." The fact that the work would be extensive (and costly) does not deprive it of its nature as "roofing." Thus, since it is apparent no permit would have been necessary under the Construction Code, the failure of the housing provider to establish that such a permit had been secured was not a ground for dismissal of the petitions.

■ Finally, petitioners contend that the Commission erroneously excused compliance with D.C.Code § 45–2520(b)(2), which required the housing provider—at the time—to establish "[t]he amount and cost of improvements exclusive of interest and service charges."[6] The Commission determined this to be "a non-issue," holding that "[t]he housing provider is not required to make such a showing as part of its *prima facie* case. Tenants can raise it as a defense, but they did not do so here." This reasoning was error. The statute declares that "[t]he *housing provider* shall establish [the amount and cost of the improvements] to the satisfaction of the Rent Administrator" (emphasis added). It does not say that the housing provider, if *challenged* on the point by the tenants, shall make the required showing. The qualifying phrase "exclusive of interest and service charges" may seem technical, but it is part of the computation the housing provid-

---

4. The circumstances the Commission deemed "not ordinary" in that case were the current failure of the instruction sheet given housing providers by the Rent Administrator to specify a permit requirement; the similar failure of the housing regulations to mention the need to prove that governmental permits and approvals had been obtained; and the absence from the "audit report" then used by the Administrator to "pre-audit" petitions for rent ceiling increases of any indication that the auditor required proof of governmental permits.

5. The same section indicates what is not a "minor repair" by stating that such repairs shall not include, *inter alia,* "the cutting away of any bearing wall, ... the removal or cutting of any structural beam or bearing support, or the removal or change of any required means of egress, or rearrangement of parts of a structure affecting the exit requirements."

6. The statute has since been changed and now requires the provider to establish the amount and cost of the improvement "including interest and service charges."

er was required to establish to meet its burden of persuasion. We conclude that the error was harmless, however, for nothing in the testimony of the housing provider's witness on the issue of costs contains the least indication that those costs included interest or service charges.[7]

For the foregoing reasons, the decision of the Rental Housing Commission is

*Affirmed.*

---

7. We have considered petitioners' remaining contentions and reject them. We note only our agreement with the Commission that D.C.Code § 45–2520(i) establishes a final date for filing a petition for approval of a rent adjustment for capital improvements made under the immediate necessity provision of § 45–2520(g), *viz.,* "within 10 calendar days from the installation of the capital improvements." The Commission thus was correct in reversing the Rent Administrator's contrary determination that the section specifies a *beginning* date for filing, so that the petitions in this case were prematurely filed and hence had to be dismissed.